## WETZELL v. CITY OF PADUCAH.

(Circuit Court, W. D. Kentucky. August 11, 1902.)

1. STATUTES—REPEAL BY IMPLICATION.

The General Statutes of Kentucky, adopted in 1873, did not repeal by implication Act March 17, 1870, in relation to submitting questions of taxation to a vote of the people, since it contains no provisions relating to the subject.

2. MUNICIPAL BONDS—ELECTION—CONSTRUCTION OF KENTUCKY STATUTE.

Act Ky. March 17, 1870 (1 Acts Ky. 1869-70, p. 102), which provides that it shall be unlawful for "any county judge, county court, police judge, justice of the peace or any incorporated company" to submit more than one proposition for taxation to the voters of a county, city, or town, or part thereof, at any one election held therein, and that any tax, subscription or donation, etc., voted at an election at which more than one such question was voted on shall be held null and void, applies only to the officers and tribunals specifically named therein, and does not affect an election ordered by a city council under power given by the city's charter, nor render bonds voted at such an election to be exchanged for stock in a railroad company void because two separate propositions were submitted at the same election, where there was nothing in the charter prohibiting such method of submission.

3. SAME—ESTOPPEL BY RECITALS.

Where the officers and council of a city are given such powers by its charter that authority must be inferred therefrom to determine whether the necessary conditions precedent exist to authorize an issuance of bonds by the city, a recital by such officers in the bonds that all such conditions have been performed will bind the city, in favor of an innocent purchaser of the bonds for value and without notice.

4. SAME—EFFECT OF PAYMENT OF INTEREST—INNOCENT PURCHASERS.

The fact that a city for a number of years promptly paid the interest on an issue of bonds raises a strong equity in favor of a holder who purchased during such time, and even if it does not create an estoppel against the city, in a strict sense, is entitled to be considered by the court, in connection with the other facts, where the city subsequently denies the validity of the bonds.

5. SAME—VALIDITY—MATTERS CREATING ESTOPPEL.

The voters of a city by a nearly unanimous vote authorized a subscription to the stock of a railroad company which projected a line to the

---

¶ 1. Repeal of statutes by implication, see note to Bank v. Weidenbeck, 38 C. C. A. 136.

¶ 3. Bona fide purchasers of municipal bonds, see note to Pickens Tp. v. Post, 41 C. C. A. 6.

city, on certain conditions, and the issuance of negotiable bonds in payment therefor. The road was built, and all the conditions complied with, and the council, by a two-thirds vote, directed the issuance of the bonds, which contained recitals of such facts. They were issued and delivered to the railroad company in exchange for its stock, which the city received and retained. For more than nine years the city promptly paid the interest on the bonds, and during that time plaintiff purchased a number of them in the open market for full value. *Held*, that such facts, considered together, estopped the city to repudiate the bonds for any mere irregularity in the proceedings prior to their issuance; the subscription to the stock and the issuance of the bonds having been expressly authorized by its charter.

At Law. Action on coupons from municipal bonds.

John F. and Arthur B. Shepley and Campbell & Campbell, for plaintiff.

R. T. Lightfoot and J. M. Worten, for defendant.

EVANS, District Judge. For several years previous to 1887 the people of Paducah, believing it would greatly promote the prosperity and growth of their city, were anxious to obtain direct railroad facilities northwardly; and doubtless this desire upon their part induced the legislature of Kentucky to insert in the act to revise the charter of that city, approved May 12, 1884 (2 Acts Ky. 1883–84, p. 1080), the provisions of section 59 thereof, in this language:

"The council, in the name of the city, shall have power to subscribe for and hold and sell stock in any public corporation for the building of roads and bridges in the commonwealth of Kentucky, and in one or more railroad companies for the building of railroads on the northwest side of the Ohio river, terminating in Paducah, to be paid by the bonds of the city, bearing interest not exceeding five per cent. per annum, the subscription not to exceed one hundred thousand dollars to any one road; and to purchase and hold any personal or real estate within or without the limits of the city; and to borrow money, subject to the following qualifications: The council shall not have the power, on behalf of the city, to create any new debt or liability exceeding twenty thousand dollars for one object or purpose, nor subscribe for stock in any incorporated company, or give the bonds of the city therefor, in amount exceeding the sum of twenty thousand dollars; nor shall the council have power to appropriate money, directly or indirectly, for any object or purpose in amount exceeding the sum of twenty thousand dollars, unless said council shall first cause an election to be held by the qualified voters of the city, and submit to a vote the question as to the propriety of creating such new liability, the subscription of stock or appropriation of money for the object or purpose proposed; and said proposition shall be voted for affirmatively by a majority of all the qualified voters of the city, which majority shall be ascertained by the assessor's book made at the last assessment next previous to the holding of such election; and it shall be the duty of the assessor, in his assessments of property, to diligently inquire of all persons assessed, and ascertain whether they are qualified voters, and to list in a column upon his book all qualified voters of the city; and if, upon taking such vote, there should be a majority of all the qualified voters of said city in favor of the proposition submitted to them, and the council thereafter, by a vote of two thirds of all the members in office, evidenced by the records of the council upon a call of the yeas and nays, shall pass an ordinance in favor of, or directing such a subscription of stock, the creation of such new debt or liability, or the appropriation of money exceeding twenty thousand dollars: provided, that the council shall have the power, without submitting the question to a vote of the people, to execute the bonds or obligations of the city renewing any existing liabilities of the city. Said council may give the bonds of the city in such sums, and payable at such times, as they shall deem most expedient."

It may be remarked that the power to subscribe for stock in two or more Illinois railroad companies orginated in the act of January 24, 1872, amending the charter of the city. See Acts Ky. 1871–72, p. 186.

From this legislation, and from the ordinances passed by the council of the city, shown in evidence, it is fair to assume that several plans to secure the desired end offered themselves in 1887. One of these was through the Chicago, St. Louis & Paducah Railway Company, and another, apparently, was through the Paducah & Mt. Vernon Railway Company and the Paducah, St. Louis & Chicago Railway Company jointly. By ordinances passed by a two-thirds vote of the council a proposition to subscribe for $100,000 of the capital stock of the Chicago, St. Louis & Paducah Railway Company was submitted to a vote of the people of the city at a special election held on May 14, 1887. At that election, as was ascertained in due form, 1,807 votes were cast in favor of the proposition, and 22 votes against it. By other ordinances passed by a two-thirds vote of the council a proposition to subscribe for $50,000 of the capital stock of the Paducah & Mt. Vernon Railway Company and $50,000 of the capital stock of the Paducah, St. Louis & Chicago Railway Company was likewise submitted to a vote of the people of the city at a special election also held on the 14th day of May, 1887. At that election, as was ascertained in due form, 1,805 votes were cast in favor of the proposition, and 21 votes against it. Doubtless the two propositions were voted upon at the same election. After the results of the election as above stated were properly ascertained and certified to the council, that body, by an ordinance passed May 23, 1887, by a "vote of two-thirds of the members in office, evidenced by the records of the council upon a call of the yeas and nays," authorized and directed the mayor of the city to subscribe on its behalf for $100,000 of the capital stock of the Chicago, St. Louis & Paducah Railway Company upon the terms and conditions contained in the ordinance submitting the proposition to the vote of the people. On the same day and in the same way the council passed another ordinance authorizing and directing the mayor to subscribe, on the same conditions, for $50,000 of the capital stock of the Paducah & Mt. Vernon Railway Company, and for $50,000 of the capital stock of the Paducah, St. Louis & Chicago Railway Company. Each of the three named railway companies was organized under the laws of the state of Illinois, and the subscription of the city of Paducah for shares of the capital stock of each was, under the ordinances referred to, made upon certain very express conditions as to the completion of all or certain parts of the work of construction stipulated for before the stock was to be paid for in bonds of the city. It is quite fair to presume that if either one of the two lines of railroad, to wit, either that of the Chicago, St. Louis & Paducah Railway Company, or that of the other two railways jointly, was completed, the other would not be so much, if at all, needed, and probably this was not an unimportant consideration affecting the interest and conduct of all the parties. At all events, nothing adequate was done by either the Paducah & Mt. Vernon Railway Company or by the Paducah, St. Louis & Chicago Railway Company to comply with the terms and

conditions specified in the ordinances providing for subscriptions to their capital stock, respectively; and consequently the city of Paducah did not take or pay for any stock in either of those companies, and did not issue any bonds or incur any obligations on account of any subscription for the stock of either. In due time and order, however, the Chicago, St. Louis & Paducah Railway Company did construct its railroad, and did fully comply with all the terms and conditions prescribed in the ordinance under which the people voted to subscribe for $100,000 of its capital stock. These facts being duly ascertained by the council, as appears from the testimony, the $100,-000 of the bonds of the city of Paducah, due in 30 years, and bearing interest at the rate of 4½ per cent. per annum, payable semiannually, were delivered to the Chicago, St. Louis & Paducah Railway Company, and in turn that company delivered to the city certificates for $100,000 of its capital stock on the 23d of January, 1889. The bonds thus delivered were in denominations of $1,000 each, were numbered serially from 1 to 100, inclusive, and 60 semiannual interest coupons were attached to each bond, payable, respectively, on June 1st and December 1st of each year. Each of the one hundred bonds was in the following form, to wit:

"$1,000.                    State of Kentucky.                    $1,000.
"City of Paducah.

"Know all men by these presents that the city of Paducah, in the county of McCracken and state of Kentucky, for value received, promises to pay to the bearer of this bond, thirty (30) years from the date hereof, the sum of one thousand dollars, with interest thereon at the rate of four and one-half per cent. per annum, payable semiannually upon the presentation and surrender of the annexed coupons as they become due, and for the payment of the principal and interest of this bond the faith and credit of said city of Paducah is irrevocably pledged. Payable at the fiscal agency of said city of Paducah, in the city of New York. It is provided that said city of Paducah reserves the right to pay this bond, with accrued interest thereon, before maturity, at any time after ten (10) years from the date hereof. This bond is one of a series of one hundred (100) bonds for one thousand dollars each, of like date, tenor, and effect, issued by the city of Paducah in payment of one hundred thousand dollars on the capital stock of the Chicago, St. Louis & Paducah Railway Company, subscribed for and delivered to said city, and is issued under and in pursuance of the provisions of the general charter of said city authorizing the same, and an ordinance of said city adopted April 25th, A. D. 1887, amended April 30th, A. D. 1887, and ratified by a majority of the qualified voters of said city at an election duly held for that purpose on the 14th day of May, A. D. 1887, and also by the affirmative vote of two-thirds of the members of the common council of said city voting in favor of and authorizing the same. The said Chicago, St. Louis & Paducah Railway Co. having duly complied with all the terms and conditions imposed upon said company as conditions precedent to the execution and delivery of this bond, the said city council has ordered the execution and delivery of the same, signed by the mayor, and attested by the clerk of the city council, and the seal of said city, and has caused the interest coupons hereto annexed to be signed by the city clerk. Done in the city of Paducah on the 1st day of December, A. D. 1888.

"Chas. Reed,
"Mayor of the City of Paducah.

"Attest: W. H. Patterson, Clerk of City Council.
"[Seal.]
"Audited January 23rd, 1889.
"D. O. Sweatman. Auditor."

The interest on each bond was regularly and promptly paid by the city up to and including that due June 1, 1889, and on July 6, 1889, the plaintiff, in open market and for full value, purchased and paid for 25 of the bonds, the serial numbers of which were 36 to 60, inclusive, and thereafter the city regularly and promptly paid all the interest coupons on said bonds accruing up to and including the one due June 1, 1898. Afterwards this ceased, and this suit was brought to enforce the payment of the coupons subsequently accruing, up to and including those due on December 1, 1900. By a stipulation in writing, the issues involved have been submitted to the judgment of the court without the intervention of a jury; and, while I do not formally yield to the request of counsel to find the facts, in the technical sense, I have set out above those upon which I think the judgment of the court must turn.

1. It must be observed that those of the pleadings which succeed the petition are quite unsatisfactory. Instead of containing statements of fact, or traverses thereof, they are mainly and at considerable length filled with statements of mere legal propositions or conclusions on one side, and a denial thereof on the other; but it is apparent that the only serious defense made in behalf of the defendant is that the provisions of the act entitled "An act in relation to submitting questions of taxation to a vote of the people," approved March 17, 1870 (1 Acts 1869–70, p. 102), requires that the bonds shall be held to be null and void because there were two propositions to make subscriptions to the capital stock of different railroad companies voted upon at the same time and at the same election. That act is in the following language:

"An act in relation to submitting questions of taxation to a vote of the people.
 "Be it enacted by the general assembly of the commonwealth of Kentucky:
 "Section 1. That it shall be unlawful for any county judge, county court, police judge, justice of the peace, or any incorporated company in this commonwealth, to submit more than one proposition for taxation, direct or indirect, to the voters of a county, city, or town, or part thereof, at any one election held therein.
 "Sec. 2. Any tax, subscription or donation, or any authority to tax, make subscriptions or donations, or otherwise, directly or indirectly, to impose a tax upon the people of such county, city or town, or part thereof, voted or granted by the voters at an election at which more than one such question was voted upon, shall be held null and void.
 "Sec. 3. All acts and parts of acts, public or private, inconsistent with the provisions of sections one and two of this act, are hereby repealed.
 "Sec. 4. This act to take effect and be in force from and after its passage.
 "Approved March 17, 1870."

As this statute declares that any "subscription" or "authority to tax" contrary to its provisions shall "be held null and void," the defense certainly presents a question of grave importance, particularly as this court would feel bound to follow the interpretation and construction of a statute of the state of Kentucky if one has been definitely settled by the court of appeals, although under the ruling in cases like that of Thompson v. Lee Co., 3 Wall. 327, 18 L. Ed. 177, and others which followed it,—notably that of Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10, 27 L. Ed. 359,—it is undoubtedly true

that if such construction appears to be settled in one way, and persons contract on the faith of such settled construction, the courts of the United States will not permit the persons thus contracting to be injured, by yielding to an entirely different but later ruling of the highest court of the state. In the case of Broadus' Devisees v. Broadus' Heirs, 10 Bush, 299, the court of appeals of Kentucky, in harmony with generally accepted principles, held that the object of the then recent revision of the statutes of Kentucky was to enact a system of laws, in a condensed form, embracing all statutory enactments of a general nature other than those excepted in the act adopting the General Statutes; that the General Statutes must be regarded as containing all the statute law on the subjects indicated by the titles therein, and that, therefore, when a section in the Revised Statutes has been omitted in the General Statutes, or any change made, however slight, in a general law, the whole law as found in the Revised Statutes on that subject must be considered and treated as repugnant to the provision of the General Statutes. It is insisted upon the part of the plaintiff that, under the operation of the rule thus settled in the Broadus Case, the act of March 17, 1870, was not in force after the adoption of the General Statutes in 1873; but the court has searched those statutes in vain for any title, section, or provision of law therein which fairly pertains to the subject of legislation covered by the act of 1870, and for that reason is of opinion that that act was not repealed by the adoption of the General Statutes. It is also insisted that the doctrine of the Broadus Case was the settled law of Kentucky, and that the supposed attempt to change it by the court of appeals in its opinion in the officially unreported case of Christian Co. v. Smith (Ky.) 12 S. W. 134, 13 S. W. 276, and wherein it was held that the act of March 17, 1870, was not repealed by the adoption of the General Statutes, should not alter or affect the rights of the plaintiff accruing before that decision, and while the rule theretofore established by the Broadus Case was in force. As already indicated, the court does not think that the Broadus Case applies to this one, because there is no provision in the General Statutes which covers the subject-matter of the act of March 17, 1870, and, for reasons which will soon appear, the court is of opinion that the ruling in the case of Christian Co. v. Smith can have no effect on what should be the ruling in this case. Shortly stated, that reason is that the act of March 17, 1870, by its terms, does not apply to the action of a "city council" at all. On reading the first section of that act, it will be seen that it only makes it "unlawful for any county judge, county court, police judge, justice of the peace, or any incorporated company" to submit more than one proposition for taxation to the voters at any one election. The legislature doubtless had a reason satisfactory to itself, and into which we cannot inquire, for limiting the prohibition to those officers and tribunals specially named in the act, and this reason may have been its knowledge that the larger cities, at least, were generally elaborately equipped with machinery and safeguards in respect to such matters; and it seems to the court to be entirely clear that the second section of the act must be held to relate only to what is referred to in section 1, and as be-

ing intended only to make null and void any act done in violation of that section by any officer or tribunal named therein. In short, by section 1 certain expressly specified acts done by certain explicitly named and described officers and tribunals are prohibited and declared to be unlawful; and, in order to leave no doubt as to what shall be the effect of a disregard of those prohibitions, the second section requires that anything done in violation thereof "shall be held null and void." This seems to the court to be the entire scope and object of the act of 1870. If section 2 stood alone, it might be different; but the court is not at liberty to do otherwise than construe the whole act together, and, in endeavoring to ascertain the legislative intent it must look at it all, and limit the general language of section 2 to the narrow and special context and purview indicated by section 1. The numbering of the clauses of a legislative enactment in many instances is for convenience and reference, rather than for interpretation (End. Interp. St. § 70); and in this case if we eliminate the section figures, and in lieu of the period at the end of section 1 insert the word "and," and then read the two sections as one sentence, we shall clearly get the exact legislative meaning. It will be observed that the phrase "county, city, or town, or part thereof" first appears in section 1 of the act; and for that reason its appearance in section 2 in no wise weakens the proposition just stated, and especially as this court judicially knows that under the laws of Kentucky there are many cases in which, for public purposes, the county court or county judge or the justices of the peace (as a fiscal court) may submit propositions for taxation to the people of a territory which would embrace a city or a town, or a part thereof. And it may be added that by no possible construction could it be held that the words "incorporated company" meant a municipal corporation. The charters of the cities of the state being usually very explicit as to the manner of authorizing subscriptions by them to desired public improvements, the general assembly did not embrace city councils in this legislation, and it is not within the power of the court to put them into it in the absence of express legislative warrant. Over this subject the legislature, whatever its reasons, had exclusive control, and the court has none. The language of the act is clear, and the court cannot add to it. The following authorities seem clearly to vindicate this construction of the act: In re Rouse, Hazard & Co., 33 C. C. A. 360, 91 Fed. 100; Reiche v. Smythe, 13 Wall. 162, 20 L. Ed. 566; Barbour v. City of Louisville, 83 Ky. 100; City of Covington v. McNickle's Heirs, 18 B. Mon. 286; Brooks v. Cook, 44 Mich. 617, 7 N. W. 216, 38 Am. Rep. 282; Board of Education v. City of Detroit, 30 Mich. 505; End. Interp. St. §§ 38, 70; Suth. St. Const. §§ 215, 218, 268, 279, 300; Sedg. St. & Const. Law, pp. 360, 361; Black, Interp. Laws, p. 141. In the case of Christian Co. v. Smith the county judge submitted two propositions for taxation to be voted upon at one election, and, that particular officer being one of those prohibited by the act of 1870 from doing so, his action was expressly declared to be unlawful, null, and void; and the reasons why that case does not control this appear to be obvious. The exact case then decided was as above stated, and its scope cannot

be expanded by expressions broader than the facts warrant. It may also be observed, as in large measure strengthening these conclusions, that while section 59 of the city's charter, enacted in 1884, gives the council the power to subscribe for stock "in one or more railroad companies for the building of railroads on the northwest side of the Ohio river, terminating in Paducah, to be paid for in bonds of the city," but requiring the question of doing so to be first submitted to the qualified voters of the city, it does not in any way require that such questions shall be voted for at separate elections; and by section 207 of the charter, approved May 12, 1884, it is provided that "all laws and parts of laws in conflict with this act are hereby repealed." The court, upon these grounds, and especially in connection with the considerations now to be stated, is constrained to hold that the bonds of the city are not null or void by reason of anything contained in the act of 1870. As that act did not apply, a purchaser of the bonds was not bound to take notice of its provisions, nor inquire whether they had been pursued.

2. While the court has already indicated that it regards as unmaintainable the one substantial defense presented by the answer of the defendant, it may be well, inasmuch as they may be thought to bear strongly upon the general result, to consider, at least briefly, the other questions raised by the pleadings or the contentions of counsel. It is urged by the plaintiff that the defendant is estopped from making any defense by the recitals in the bonds, which, it is contended, are sufficient to show an innocent purchaser that the laws under which they were issued, and all the terms and conditions prescribed in the ordinance, were duly performed and complied with. The law upon the subject would seem very clear, unless, contrary to what has already been said, the act of 1870 applies and controls. If that act, by construction, must be held to embrace the case of a submission of two propositions for taxation at the same election by a "city council," although that body is not named in the act, then, if nothing else appeared, it might be somewhat difficult to distinguish this case, in principle, at least, from those of which the case of German Sav. Bank v. Franklin Co., 128 U. S. 526, 9 Sup. Ct. 159, 32 L. Ed. 519, may be cited as a type; but the court is of opinion that it must be inferred from other provisions of the city charter (sections 4, 46, 59, 77, 88, 179, 189, 190) that the council, the mayor, and the other officers of the city who acted in this case, lawfully constituted a tribunal duly authorized and empowered, on behalf of the city, to ascertain and certify the facts recited in the bonds, including the question of whether all the laws under which the bonds were issued had been complied with; and the court is of opinion, under these circumstances, that those recitals are sufficient to estop the city from asserting that all those conditions had not been fully met. Knox Co. v. Aspinwall, 21 How. 539, 16 L. Ed. 208; Pana v. Bowler, 107 U. S. 529, 2 Sup. Ct. 704, 27 L. Ed. 424; Andes v. Ely, 158 U. S. 312, 15 Sup. Ct. 954, 39 L. Ed. 996; Evansville v. Dennett, 161 U. S. 434, 16 Sup. Ct. 613, 40 L. Ed. 760; Provident Life & Trust Co. v. Mercer Co., 170 U. S. 593, 18 Sup. Ct. 788, 42 L. Ed. 1156; Waite v. City of Santa Cruz, 184 U. S. 302, 22 Sup. Ct. 327, 46 L. Ed.

552; and other cases too numerous to name. The evidence offered shows that the subscription for the stock of the Chicago, St. Louis & Paducah Railway Company was made after a duly authorized election had shown that a majority of all the qualified voters of the city were in favor of it, and that, in the language of the charter, "the council thereafter, by a vote of two-thirds of all the members in office, evidenced by the records of the council, upon a call of the yeas and nays," passed the ordinance directing the subscription for the stock. Upon the case as presented, and holding that the act of 1870 does not apply nor control it, the court is of opinion that the city of Paducah is bound by the recitals in the bonds, as between it and an innocent purchaser thereof for value and without notice; and the court has ascertained from the evidence that the plaintiff was such.

3. It is also contended that the city is estopped from any defense, as against the plaintiff, because of the payment of the interest on the bonds for over nine years, covering a period both before and after the plaintiff purchased. If the bonds, under the Kentucky law, were "null and void" ab initio, it is possible, if nothing else appeared, that the city would not be estopped from so pleading. This would seem to result from the ruling of the supreme court in the case of Doon Tp. v. Cummins, 142 U. S. 366, 12 Sup. Ct. 220, 35 L. Ed. 1044, where it was claimed and shown that the bonds then in contention were issued in disregard of the limits clearly fixed by the constitution of Iowa. But unless they were absolutely void, strong support to the claim of estoppel in this case is found in the opinion of the court in the case of Ray Co. v. Vansycle, 96 U. S. 687, 688, 24 L. Ed. 800, where the court lays particular stress upon the fact not only that several installments of interest had been paid, but also that certificates of stock in the railroad company were delivered to the county in payment of the bonds; that the certificates were still held by the county; that they had never been tendered back for cancellation; and that when the county refused to further pay interest no intimation was given of its willingness to cancel the certificates of stock. The county was held to be estopped under all the facts in that case, which, in many of its features, is strikingly like the one now being considered. Equally strong is the case of Clay Co. v. Society for Savings, 104 U. S. 590, 591, 26 L. Ed. 856. When a person desires to invest in municipal bonds, it is a most important matter to him to obtain those upon which the promised interest has been promptly paid, and for the payment of which he may fairly assume that taxes have been levied and collected. This state of fact brought about by a municipality will be a strong inducement to purchase, because such levying and collection of taxes, and the payment of interest on the bonds, must necessarily induce an innocent intending purchaser to conclude that the municipality regards the bonds as valid and binding upon itself. Coupled with such recitals as are contained in the bonds in this instance, the long-continued payment of interest after the plaintiff purchased its bonds, as well as before, even if not amounting to matter of estoppel, in the strict sense (upon which the court at this point expresses no positive opinion), is certainly, to say the least,

not without much weight with the court, when viewed in connection with all the other facts of the case.

4. Stress is also laid upon other grounds of estoppel in conjunction with those already mentioned. It clearly appears from the evidence (1) that the people of Paducah well-nigh unanimously voted in favor of subscribing for the stock of the railway company,—a vote which they must have known and intended would almost necessarily lead to the issuing of the bonds of the city to pay for the stock; (2) that, at least in some measure, upon the faith of that vote the much-desired railroad was built, and, it is fair to assume, at great cost to the company; (3) that, all the terms and conditions precedent being fully performed by the railroad company, the city council, in the exact manner prescribed by the charter, passed an ordinance directing the mayor to subscribe for the stock; (4) that the bonds of the city to pay for the stock, and containing all the pledges, recitals, and assurances embraced therein, were issued, payable to bearer, and duly delivered; (5) that certificates for $100,000 of the stock of the railway company were issued and delivered to the city, and there is no intimation that this stock is not still owned by it; (6) that the interest coupons on the bonds were regularly and promptly paid by the city for over nine years, thus affording by these acts of the city additional inducements to purchase the bonds, and further assurance of their validity; (7) that the city in these ways got the desired railroad facilities north of the river, which are permanent and enduring; and (8) that though resolving no longer to pay the interest on the bonds, which they now insist are illegal, there has been no intimation of any purpose or desire upon the part of the city to return or cancel the certificates of stock, nor of any purpose or desire otherwise to return the money, or its equivalent, obtained for the bonds. All the benefits derived from the transaction are retained by the city, but the consequent obligations are not to be met or discharged; and it must be apparent that the unanimity with which those obligations were assumed by the city gave no indication of such a course of conduct on the part of the municipality, whose credit had stood high, if the price paid in the open market by the plaintiff for its bonds affords a true test for determining that question. While probably some and certainly others of the alleged grounds would not of themselves afford adequate support to a plea of estoppel, combined they constitute such a vindication of plaintiff's demand to relief that it is difficult to suppose that any court of justice would deny it. The council of the city, when it passed on December 5, 1898, the resolution offered in evidence by the defendant in regard to an ordinance declining further to pay interest on the bonds, must have felt the pressure of the obligations resulting from the facts of this case, and apparently sought to embody in the resolution some apology for its passage, by avowing therein "that said council was not actuated or in any manner prompted by any spirit or motive of a repudiation or a rejection of the justice, morally, of the claims of the bondholders in question upon the city," but, while recognizing the "justice, morally," of the claim of the bondholders, declared that its action was based

upon what a majority of its members had concluded at that late day were the demands of the constitution and laws of Kentucky. It seems to the court to be matter of congratulation for the city itself, under all the circumstances of the case, that neither the laws nor the constitution of Kentucky make any "demand" nor afford any countenance for such a disregard of those obligations, and that the members of the council were mistaken in the view they took of it. On the contrary, these bonds and their validity seem to be most strongly buttressed, not only by those laws and by the facts proved, but also by the "justice, morally," and the right of the case. The court is not unmindful of the observations of Mr. Justice Harlan, in rendering the opinion of the court in the case, cited in argument of Buchanan v. Litchfield, 102 U. S. 278, 26 L. Ed. 138, upon the subject of considerations merely moral in their bearing upon the decision of causes, where those considerations apparently come in collision with positive and well-established principles of law; but it must be remembered that moral obligations always play a most important part in questions of estoppel, for generally, the main, if not the only, support of such a plea is a moral obligation. Such pleas are generally upheld, if at all, upon the ground that it is against equity and good conscience for a party to insist upon a given claim or defense. Besides, it might also be suggested by that opinion of Mr. Justice Harlan that, if the bonds in this case are held to be null and void, then the city holds the value received for them as money which, ex æquo et bono, it should not retain, and which after demand might possibly be recovered from it by the parties entitled. In view of what has been stated, it appears to the court, after a very full and laborious consideration of all the facts and the law of the case, that the bonds from which the coupons sued on were taken are valid obligations of the city of Paducah, and consequently that the plaintiff is entitled to payment of the interest demands evidenced by those coupons.

5. And lest there might be some uncertainty upon one point, it may be well to add that, in the opinion of the court, the bonds are perfectly valid independently of any recitals they may contain, and independently of all matters of estoppel pleaded by the plaintiff. In the opinion of the court, they are valid because the testimony shows that they were duly and properly issued, upon good consideration, by the proper authorities of the city, for a lawful and beneficial purpose, and after the qualified voters, in proper manner and form, had authorized it.

The judgment of the court will therefore be that the plaintiff recover as prayed in his petition.